## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) ALLEN CONTRACTING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 5:18-cv-00676-JD |
| | ) | |
| (1) THE DRILLER, LLC, and Iowa limited.; | ) | |
| liability company; and | ) | |
| (2) HORIZONTAL BORING & TUNNELING | ) | |
| CO., a Nebraska corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## ALLEN'S OBJECTION TO TDL'S
## MOTION FOR SUMMARY JUDGMENT

Robert L. Magrini, OBA #12385
Evan B. Gatewood, OBA #13412
Christopher D. Skelton, OBA #32920
**HAYES MAGRINI & GATEWOOD**
1220 North Walker
Oklahoma City, Oklahoma 73103
Telephone:   (405)235-9922
Facsimile:   (405) 235-6611
E-Mail:      robert@hmglawyers.com
             egatewood@hmglawyers.com
             cskelton@hmglawyers.com

*Attorneys for Plaintiff, Allen Contracting, Inc.*

# TABLE OF CONTENTS

**ALLEN'S RESPONSE TO TDL'S STATEMENT
OF UNDISPUTED MATERIAL FACTS** ....................................................... 2

**ALLEN'S STATEMENT OF ADDITIONAL FACTS PREVENTING
SUMMARY JUDGMENT FOR TDL** ............................................................ 9

**LEGAL ARGUMENTS AND AUTHORITIES** .......................................... 19

    I.      ALLEN'S PROMISSORY ESTOPPEL CLAIM ...................................... 20

    II.     TDL WAS PROPERLY TERMINATED BECAUSE IT FAILED TO
              PERFORM ITS CONTRACTUAL OBLIGATIONS .............................. 23

# TABLE OF AUTHORITIES

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ........................................................... 20

*Buchanan v. Sherrill,*
  51 F.3d 227 (10th Cir. 1995) ............................................ 20

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ........................................................... 20

*Cholier, Inc. v. Torch Energy Advisors, Inc.,*
  83 F.3d 431 (10th Cir. 1996) ............................................ 22

*Crawford v. Pioneer Box & Lumber, Co.,*
  105 Cal. App. 760 (1930) ................................................. 24

*EKE Builders, Inc. v. Quail Bluff Assoc.,*
  714 P.2d 604 (Okla. Civ. App. 1985) ............................... 24

*Express Services, Inc. v. Averette,*
  CIV-06-820-C, 2007 WL 1888652 (W.D. Okla. June 29, 2007) ........................... 27

*Finnell v. Jebco Seismic,*
  67 P.3d 339 (Okla. 2003) ................................................. 24

*Murphy Oil USA, Inc. v. Wood,*
  438 F.3d 1008 (10th Cir. 2006) ........................................ 26

*Patel v. Harless,*
  926 P.2d 963 (Wyo. 1996) ................................................ 21

*Scott v. Harris.,*
  550 U.S. 372 (2007) ........................................................... 20

*Townsend v. Melody Home Mfg.,*
  541 P.2d 1370 (Okla. Civ. App. 1975) ............................. 24

*Vogel v. Fisher,*
  225 P.2d 346 (Okla. 1950) ............................................... 24

*Zero Down Supply Chain Solutions, Inc. v. Am. Airlines, Inc.,*
  05-CV-327-TCK-PJC, 2006 WL 8458208 (N.D. Okla. May 18, 2006) ................ 26

## **OTHER AUTHORITIES**

13 Richard A. Lord, *Williston on Contracts* 38:15 ........................................................... 23

17 C.J.S. 967 ........................................................................................................ 23

Fed.R.Civ.P. 56(c) ................................................................................................ 19

Fed.R.Civ.P. 56(e)(2) ........................................................................................... 20

The Restatement (Second) of Contracts
    § 205 (1981) .................................................................................................. 23, 26

## ALLEN'S OBJECTION TO TDL'S
## MOTION FOR SUMMARY JUDGMENT

Plaintiff, Allen Contracting, Inc. ("Allen"), objects to the motion for summary judgment filed by defendant, The Driller, LLC ("TDL").  Allen is the general contractor on a construction project for the Oklahoma Department of Transportation ("ODOT") known as, "ODOT Project ACNHPPI-2350(004)SS/ACNHPPI-2350(005)SS, Job Piece No.: 90933(16)/0933(25) (Grade, Drain, Surface, and Bridge) I-235: From NW 36th Street Interchange, Extend North in Oklahoma City" ("Project").  The Project was/is an extremely high-profile expansion of I-235 (Broadway Extension), with challenging coordination issues, lane closures and significant delay-related damages.  TDL is a subcontractor specializing in underground horizontal borings and associated work.

Two of TDL's former employees/managers, Kris and Brandon Young (collectively, the "Youngs"), prepared bids on behalf of TDL to install large diameter reinforced concrete pipes ("RCP"), which would act as critical drainage conduits at the Project.  TDL's proposals were submitted to and relied upon by Allen when bidding to ODOT.  Allen formally accepted TDL's bid after it was awarded a contract by ODOT.  TDL recognized it would need to sign a formal subcontract agreement, promptly submit an acceptable work plan to Allen, and otherwise begin advancing the Project.  The Youngs had every intention of doing so but were prevented from moving forward by TDL's majority owner, Brent Moore ("Moore").[1]  To avoid delaying the Project, Allen was ultimately left with no choice but to hire a different subcontractor to perform TDL's work.  It filed this action to recover

---

[1] Moore also owns defendant, Horizontal Boring & Tunneling Co. ("HBT").

its loss.

TDL now attempts to justify its repeated delays, broken promises and general lack of performance by arguing that: a) Allen cannot maintain an action based on promissory estoppel/detrimental reliance because it formally accepted TDL's written bid proposal; b) the subcontract Allen tendered to TDL for signature differed materially from its bid; and, c) Allen is the one that supposedly breached its contract with TDL.  The arguments are without merit.  Allen will respond to TDL's factual statement in the same order as set forth in its motion.

**ALLEN'S RESPONSE TO TDL'S**
**STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.      Admitted.

2.      Admitted.  TDL has considerable experience in estimating, bidding and performing subsurface horizontal boring projects throughout the United States.

3.      Admitted.   Allen's representative, Reed Greenhill ("Greenhill") dealt exclusively with the Youngs, who were authorized to prepare bids on behalf of TDL.  The Youngs alone estimated and bid the Project for TDL.  (See, Paragraph 2 of "Allen's Statement of Additional Facts Preventing Summary Judgment for TDL").

4.      Admitted, with explanation.  Allen did not provide the information TDL needed to prepare its bid.  Rather, TDL had access to ODOT's plans, specifications and other documentation and data needed to prepare its bid proposal ("Solicitation Documents").  TDL was also cautioned to conduct its own subsurface investigation prior

to bidding the Project, if it needed or desired additional information.  (See, Paragraphs 1 and 3 of "Allen's Statement of Additional Facts Preventing Summary Judgment for TDL").

5.     Denied.  This statement is not supported by the record reference.  Ms. Young first testified that Greenhill reiterated "what we already knew, it was hard sandstone," and then stated she could not recall Greenhill telling her "the subsurface would cut like hard dirt."   Ms. Young was fully aware of the subsurface conditions at the Project when preparing TDL's bids.  (See, pg. 120 lns. 16-20 and pg. 121 lns. 5-8 of Exhibit 4 to TDL's motion [Dkt. 61-4]; and, Paragraph 5 of "Allen's Statement of Additional Facts Preventing Summary Judgment for TDL").

6.     Admitted, with explanation.  TDL first submitted a bid to Allen in January 2016, and then reaffirmed its pricing when the Project was re-let in April 2016.  (See, Paragraph 5 of "Allen's Statement of Additional Facts Preventing Summary Judgment for TDL").

7.     Admitted.

8.     Admitted.

9.     Denied, as stated.  TDL's proposal also refers to itself as a "proposal" and as a "quote."  The distinction is immaterial.  (See, Paragraphs 7 and 8 of "Allen's Statement of Additional Facts Preventing Summary Judgment for TDL").

10.     Admitted.

11.     Denied, as stated.   These statements are not supported by the record references.  In the deposition testimony cited by TDL, Greenhill stated he is not a contract lawyer and does not know if the proposal would be considered a contract.  And while he

expressed his belief that the proposal created a "written binding obligation between the two entities," he did not say the relationship was governed exclusively by the express terms of TDL's proposal.  Moreover, Allen made it clear when accepting the proposal that TDL was expected to sign a formal subcontract agreement and the Youngs recognized TDL would need to sign a written subcontract and promptly provide a work plan (and other submittals) to Allen.  TDL did not express any concerns or objections to Allen's subcontract language until October 31, 2016–more than five months after it first received a copy of the subcontract (and after many broken promises to sign it).  Even Moore admits it is standard practice to execute a mutually agreeable subcontract, and that TDL was obligated to sign a subcontract and provide a work plan (and other submittals) to Allen.  Unfortunately, he (acting on behalf of HBT) prevented the Youngs from taking the steps necessary to satisfy TDL's obligations.  (See, pg. 37 lns. 7-11 of Exhibit 3 to TDL's motion [Dkt. 61-3]; and, Paragraphs 7, 8, and 10 of "Allen's Statement of Additional Facts Preventing Summary Judgment for TDL").

12.    Admitted in part and denied in part.  Allen admits sending the referenced memorandum to TDL.  However, the subcontract tendered by Allen did not materially alter, override or supersede TDL's proposal–the proposal was attached to and incorporated in the proposed subcontract.  (See, pg. 10 of 26 of Exhibit 9 to TDL's motion [Dkt. 61-9]; and, Paragraph 8 of "Allen's Statement of Additional Facts Preventing Summary Judgment for TDL").

13.    Admitted.

14.    Admitted.

15.     Denied.  ODOT's plans only provided a proposed design at elevation depths while leaving the specific means and methods for installing the RCP up to the contractors. Allen opted to use the horizontal boring method because an open cut trench was not feasible given the proximity to the highway.  The timing of ODOT's approval is directly attributable to TDL's inexcusable, months-long delay in providing an acceptable work plan (which had to be approved by ODOT).  (See, Paragraph 9 of "Allen's Statement of Additional Facts Preventing Summary Judgment for TDL").

16.     Admitted.  Allen relied upon TDL's stated expertise in estimating, bidding and performing subsurface horizontal boring projects.

17.     Admitted.

18.     Admitted, although Allen denies the suggestion it had reason to question the amount of or to be concerned about any aspect of TDL's bid.  The Youngs do not believe they underbid the Project.  (See, Paragraph 6 of "Allen's Statement of Additional Facts Preventing Summary Judgment for TDL").

19.     Denied.  These statements are not supported by and are contrary to the record references.  Greenhill did not admit failing to satisfy some sort of obligation to "fully understand" TDL's bid.  On the contrary, Greenhill testified that rock exclusions are not unusual and that he had no reason at the time to question or be concerned about TDL's bid proposal.  (See, pg. 90 lns. 2-5 and 17-23, and pg. 192 lns. 14-21 of Exhibit 3 to TDL's motion [Dkt. 61-3]; and, Paragraph 6 of "Allen's Statement of Additional Facts Preventing Summary Judgment for TDL").

20.    Admitted in part and denied in part.  Allen admits Terracon Consultants, Inc. ("Terracon") was the geotechnical engineering firm that prepared subsurface reports for the Project.  Section 102.06 of ODOT's specifications cautions bidders to not rely upon ODOT's subsurface investigations, and to conduct their own "investigation, interpretation, and judgment."  (See, Paragraph 3 of "Allen's Statement of Additional Facts Preventing Summary Judgment for TDL").

21.    Denied.  Greenhill did not testify that ODOT or Allen had failed to obtain "enough proper geotechnical information" for the Project.  That assertion is made in Moore's declaration, but he was not involved in estimating or bidding the Project for TDL, and the Youngs were satisfied with the subsurface, geotechnical reports contained in the Solicitation Documents.  TDL should not have submitted bids to Allen if it needed additional information or was otherwise dissatisfied with the Solicitation Documents.  (See, Paragraphs 2 and 5 of "Allen's Statement of Additional Facts Preventing Summary Judgment for TDL").

22.    Admitted in part and denied in part.  Allen admits TDL hired Terracon to perform additional subsurface investigations months after it had already bid the Project, and that Terracon issued a report in July 2016 ("Supplemental Report").  Terracon's Supplemental Report does not indicate subsurface conditions different than those shown in the geotechnical reports included in the Solicitation Documents or falling within the rock exclusion in TDL's proposal.  TDL fully anticipated the exact conditions shown in Terracon's reports and included all associated costs in its bid price.  (See, Paragraphs 5 and 16 of "Allen's Statement of Additional Facts Preventing Summary Judgment for TDL").

23.     Denied, as stated.   Terracon's Supplemental Report does not depict subsurface conditions different than those shown in the geotechnical reports included in the Solicitation Documents or falling within the rock exclusion in TDL's proposal.   TDL fully anticipated the exact conditions shown in Terracon's reports and included all associated costs in its bid price.   (See, Paragraphs 5 and 16 of "Allen's Statement of Additional Facts Preventing Summary Judgment for TDL").

24.     Denied.   TDL did not assist, cooperate or otherwise work with Allen to advance the Project in any respect.   (See, Paragraphs 10-15 of "Allen's Statement of Additional Facts Preventing Summary Judgment for TDL").

25.     Denied, as stated.  On October 27, 2016, Allen wrote to Moore expressing its frustration over TDL's broken promises, inexcusable delays and general inaction.  Allen did not threaten "to file suit under the Proposed Subcontract."   Rather, Allen advised TDL that it must receive an acceptable work plan and signed subcontract agreement by October 31, otherwise, it would file suit "for specific performance to enforce our agreement (a reference to the fact that Allen had relied upon TDL's bid and also formally accepted its proposal)."   Allen further notified TDL that "if the Project time constraints force Allen to hire another subcontractor to perform TDL's scope of work, we will look to TDL/HBT for payment of all sums incurred over and above the price proposed by TDL on April 18, 2016…."  (See, Exhibit 12 to TDL's motion [Dkt. 61-12]; and, Paragraph 12 of "Allen's Statement of Additional Facts Preventing Summary Judgment for TDL").

26.     Admitted in part and denied in part.  Allen admits TDL took the position for the first time on October 31 that: its April 2016 bid proposal created a binding agreement;

it was not bound by the unsigned subcontract agreement tendered by Allen; and, that the proposed subcontract somehow altered the exclusions and clarifications included in its bid. TDL did not, however, commit to performing in accordance with its April 2016 proposal. Rather, TDL told Allen it was, "in the process of determining the appropriate equipment and also the time and material cost to perform the drilling work in rock."  TDL also demanded "reasonable assurance from Allen that it will pay TDL on a time and material basis for drilling in rock as agreed to in the Proposal."[2]  Despite promising to do so, TDL never submitted any additional cost information to Allen.  (See, Exhibit 13 to TDL's motion [Dkt. 61-13]; and, Paragraph 14 of "Allen's Statement of Additional Facts Preventing Summary Judgment for TDL).

27.   Admitted.   Allen was not obligated to provide reasonable payment assurances to TDL.  (See, Paragraph 17 of "Allen's Statement of Additional Facts Preventing Summary Judgment for TDL").

28.   Admitted.

29.   Admitted in part and denied in part.  Allen admits being in communication with A.R. Daniels ("Daniels") in October 2016.  However, the record reference does not support TDL's assertion that Allen ordered or directed TDL to not perform its obligations. (See, pgs. 218:24-219:2 of Exhibit 3 to TDL's motion [Dkt. 61-3]; and, Paragraph 15 of "Allen's Statement of Additional Facts Preventing Summary Judgment for TDL").

---

[2] TDL did not ask Allen to "provide assurance that it would allow The Driller to proceed," as alleged in Paragraph 26 of its motion.  TDL wanted Allen to assure it would pay a re-negotiated price.

30.     Denied.  The shale at issue in March 2017 was not at the location of the horizontal borings necessary to install RCP.[3]  (See, Paragraph 15 of "Allen's Statement of Additional Facts Preventing Summary Judgment for TDL").

31.     Admitted, with explanation.  The shale at issue in March 2017 was not at the location of the horizontal borings necessary to install RCP.  (See, Paragraph 15 of "Allen's Statement of Additional Facts Preventing Summary Judgment for TDL").

32.     Denied.  (See, Paragraph 15 of "Allen's Statement of Additional Facts Preventing Summary Judgment for TDL").

33.     Admitted, although Allen denies the suggestion that it had a reason to question the amount of or otherwise be concerned about TDL's bid.  The Youngs do not believe they underbid the Project.  (See, Paragraph 6 of "Allen's Statement of Additional Facts Preventing Summary Judgment for TDL").

### ALLEN'S STATEMENT OF ADDITIONAL FACTS <u>PREVENTING SUMMARY JUDGMENT FOR TDL</u>

The following additional, material facts prevent summary judgment in TDL's favor:

1.     In December 2015, Allen solicited a price quote from TDL to perform the horizontal boring/RCP work at the Project.  Like all other bidders, TDL had access to the Solicitation Documents, which included geotechnical reports prepared by Terracon identifying the subsurface conditions bidders would likely encounter at the Project.  The

---

[3] Under the terms of its proposal, TDL was not even going to be involved in digging the bore pits, so any legitimate rock in that area would not have impacted its work scope.

Solicitation Documents incorporate, reference, advise, and instruct all bidders that the Project is governed by ODOT standards and specifications, as well as those adopted by the Federal Highway Administration ("FHWA").  (See, Paragraph 4 of the Affidavit of Reed Greenhill ("Greenhill Affidavit"), attached as Exhibit 1; Deposition Exhibit No. 3, attached as Exhibit 2; Deposition Exhibit No. 49, attached as Exhibit 3; and, pgs. 38:18-39:6 and pg. 121 lns. 17-20 of the Deposition of Kris Young ("K. Young Deposition"), attached as Exhibit 4).

    2.    Greenhill dealt exclusively with the Youngs, who were authorized to prepare bids on behalf of TDL.  The Youngs alone estimated and bid the Project for TDL.  They knew the bidding process was governed by ODOT and FHWA standards and specifications.  (See, Paragraph 6 of the Greenhill Affidavit, attached as Exhibit 1; pg. 40 lns. 3-21 of the K. Young Deposition, attached as Exhibit 4; pgs. 160:21-161:14 and pg. 240 lns. 2-10 of the Deposition of Brent Moore ("Moore Deposition"), attached as Exhibit 5; pg. 38 lns. 2-4 and pgs. 51:23-52:17 of the Deposition of Brandon Young ("B. Young Deposition"), attached as Exhibit 6).

    3.    Section 102.06 of ODOT's specifications states, in pertinent part:

> Do not rely on information from the Department's boring and subsurface investigations to assess the difficulty of the work described in the Proposal Forms or to describe the actual conditions that may be encountered.  <u>Do not substitute the Department's investigations for bidder investigation, interpretation, and judgment.  The Department considers submissions of a Proposal as evidence that the bidder understands and is satisfied with the work conditions and the requirements of the proposed Contract.</u>  (Emphasis Added).
>
>     (See, Section 102.06, attached as Exhibit 7).

4.      ODOT's specifications also contain what is commonly called a changed or

hidden conditions clause authorizing additional payment to Allen/TDL if they encountered

subsurface conditions materially different than those shown in the Solicitation Documents.

Section 104.03 of ODOT's specifications provides:

> During the progress of the work, if subsurface or latent
> physical conditions are encountered at the site differing
> materially from those indicated in the Contract or if unknown
> physical conditions of an unusual nature, differing materially
> from those ordinarily encountered and generally recognized as
> inherent in the work provided for in the Contract, are
> encountered at the site, the party discovering such conditions
> shall promptly notify the other party in writing of the specific
> differing conditions before the site is disturbed and before the
> affected work is performed.
>
> Upon written notification as provided in Subsection 104.06,
> "Notification of Differing Site Conditions, Changes, and Extra
> Work," the Resident Engineer will investigate the conditions,
> and if it is determined that the conditions materially differ and
> cause an increase or decrease in the cost or time required for
> the performance of any work under the Contract, an
> adjustment, excluding anticipated profits, will be made and the
> Contract modified in writing accordingly.   The Resident
> Engineer will notify the Contractor of the determination
> whether or not an adjustment of the Contract is warranted.
>
> (See, Section 104.03, attached as Exhibit 8).

5.      TDL had several months to study the Solicitation Documents and to conduct

any independent testing it desired to evaluate all conditions potentially impacting its price

quote.  The Youngs were satisfied with the subsurface, geotechnical reports contained in

the Solicitation Documents.  TDL submitted its first written proposal to Allen on January

21, 2016, and then reaffirmed its pricing on April 18, 2016.  The Youngs determined what

was included and/or excluded from TDL's pricing.  Ms. Young knew "hard sandstone"

rock would be encountered at the Project.  It did not concern her since there is no material difference between "hard dirt" and sandstone–both are drillable and TDL had the "tooling and expertise" to handle it.  TDL anticipated these conditions when submitting its bid to Allen and included all associated costs in its bid price.[4]  Allen relied upon and used TDL's bid when formulating its bid to ODOT.  (See, Paragraphs 5 and 6 of the Greenhill Affidavit, attached as Exhibit 1; pg. 40 lns. 3-21, pgs. 48:13-49:9, pgs. 120:16-121:20, and pgs. 124:18-125:11 of the K. Young Deposition, attached as Exhibit 4; pgs. 87:17-91:11 and pgs. 136:23-137:1 of the B. Young Deposition, attached as Exhibit 6; and, pgs. 160:21-161:14, pgs. 191:18-192:12, and pg. 240 lns. 2-10 of the Moore Deposition, attached as Exhibit 5).

6.  The Youngs do not believe they underbid the Project.  Rock exclusions are common in this type of work, and Allen had no reason to question the amount of or to be concerned about any aspect of TDL's bid.  (See, pg. 166 lns. 9-11 of the B. Young Deposition, attached as Exhibit 6; and, pg. 90 lns. 12-22 and pgs. 191:22-193:16 of the Deposition of Reed Greenhill ("Greenhill Deposition"), attached as Exhibit 9).

7.  On May 9, 2016, Allen formally accepted and executed TDL's proposal.  Allen made it clear when accepting the proposal that TDL was expected to sign a formal subcontract agreement; the Youngs recognized TDL would need to sign a written subcontract and promptly provide a work plan (and other submittals) to Allen.  Even Moore

---

[4] Moore has acknowledged that classifying material as excluded "rock" is a determination to be made by geotechnical experts.  (See, pgs. 188:1-189:16 of the Moore Deposition, attached as Exhibit 5).

admits it is standard practice to execute a mutually agreeable subcontract, and that TDL was obligated to sign a subcontract and provide a work plan (and other submittals) to Allen. (See, pgs. 36:6-37:25 and 118:11-121:16 of the Greenhill Deposition, attached as Exhibit 9; pgs. 55:21-58:3, pgs. 85:13-86:19, and pgs. 92:20-94:1 of the K. Young Deposition, attached as Exhibit 4; pgs. 145:19-146:3 of the B. Young Deposition, attached as Exhibit 6; and, pgs. 215:1-216:15 and pgs. 297:9-299:6 of the Moore Deposition, attached as Exhibit 5).

8.      On May 20, 2016, Allen sent a written subcontract to TDL.  Article 13.b. of the proposed subcontract states, in pertinent part:

> This Subcontract **and the documents referred to herein** set forth the entire understanding of the parties with respect to the subject matter hereof.  Any previous agreements or understandings between the parties regarding the subject matter hereof are merged into and are superseded by this Subcontract.  (Emphasis Added).

Article 4.a. of the proposed subcontract clearly and unambiguously provided for payment to TDL based on the "Attached Unit Price Breakdown and Quote."  TDL's April 2016 bid was attached to and incorporated in the subcontract.   In the event TDL encountered work beyond its base scope, Article 5.c. of the subcontract provided for payment on a time and materials basis. In fact, TDL's proposal was attached to and incorporated by reference in the proposed subcontract.  TDL did not express any concerns or objections to Allen's subcontract language until October 31, 2016–more than five months after it first received a copy of the subcontract (and after many broken promises to sign it).  In short, everyone involved in the bidding process for both Allen and TDL

understood the path forward.  (See, pg. 10 of 26 of Exhibit 9 to TDL's motion [Dkt. 61-9];

Paragraph 8 of the Greenhill Affidavit, attached as Exhibit 1; pgs. 56:16-58:3 of the K.

Young Deposition, attached as Exhibit 4; pgs. 215:1-216:15 and pgs. 297:9-299:6 of the

Moore Deposition, attached as Exhibit 5; and, pgs. 145:19-146:3 of the B. Young

Deposition, attached as Exhibit 6).

    9.    On May 24, 2016, ODOT issued a notice to proceed to Allen.  Allen

immediately asked TDL to provide its written work plan detailing how TDL intended to

accomplish its work.  ODOT's plans only provided a proposed design at elevation depths

while leaving the specific means and methods for installing the RCP up to the contractor.

Allen opted to use the horizontal boring method because an open cut trench was not feasible

given the proximity of the highway.  The work plan had to be approved by ODOT and was

critically needed by Allen to coordinate the ordering and fabrication of RCP from the pipe

supplier, Rinker Materials ("Rinker").  (See, Paragraph 8 of the Greenhill Affidavit,

attached as Exhibit 1; Deposition Exhibit No. 11, attached as Exhibit 10; pgs. 85:3-86:19,

pgs.119:18-120:15, and pgs. 157:7-158:8 of the K. Young Deposition, attached as Exhibit

4; and, pgs. 60:14-65:9 and pgs. 133:10-136:4 of the Greenhill Deposition, attached as

Exhibit 9).

    10.    Allen emphasized to TDL on multiple occasions the critical need to take

steps to advance the Project so physical work could begin on schedule.  Promptly installing

the RCP was essential to controlling flooding so that other Project work could proceed in

an orderly and productive manner.  Allen spent several months trying to get TDL to provide

a written work plan,[5] return a signed subcontract, and otherwise move forward with the Project.  TDL never expressed any concerns about or objections to its bid, subsurface conditions, Allen's proposed subcontract, the scheduling demands of the Project, or any other issue.  On the contrary, TDL repeatedly assured Allen it would furnish the necessary work plan and return a signed subcontract.  It failed to do so.  Unbeknownst to Allen, Moore/HBT was preventing the Youngs from providing the work plan to Allen, returning a signed subcontract, or taking the other steps necessary to timely commence TDL's work.[6] (See, Paragraph 9 of the Greenhill Affidavit, attached as Exhibit 1; pgs. 61:11-64:8, pg. 90 lns. 5-24, pg. 91 lns. 4-12, pgs. 92:20-94:1, and pg. 99 lns. 3-18 of the K. Young Deposition, attached as Exhibit 4; and, pgs. 204:12-205:17, pg. 206 lns. 4-23, pg. 208 lns. 7-15, pg. 221 lns. 6-25, pgs. 230:14-231:7, and pg. 247 lns. 4-22 of the B. Young Deposition, attached as Exhibit 6).

11.    By late August 2016, Allen was becoming increasingly concerned about TDL's broken promises and lack of action.  Allen communicated with TDL on several occasions in September and October 2016, about the need to proceed diligently with its work.  TDL never expressed any reservations or misgivings about its bid, subsurface conditions, Allen's proposed subcontract, the scheduling demands of the Project, or any other issue.  (See, Paragraph 10 of the Greenhill Affidavit, attached as Exhibit 1).

---

[5] Allen was unable to promptly secure ODOT's approval due to TDL's inexcusable, months-long delay in providing an acceptable work plan.
[6] Moore also owns defendant, Horizontal Boring & Tunneling Co. ("Horizontal").

12.     On October 12, 2016, Allen spoke to Moore and learned that he had terminated the Youngs on October 6.  By letter dated October 27, Allen informed TDL it would be forced to engage a different subcontractor if TDL did not promptly provide an acceptable work plan and return an executed subcontract.  Later that day (October 27), TDL submitted a work plan to Allen.  The work plan was wholly inadequate.  Internal emails show that TDL intended to provide a vague and generic work plan.  TDL's work plan removed the equipment to be utilized and provided no specific details needed for submittal to ODOT and to coordinate with the RCP supplier, Rinker.  (See, Exhibit 12 to TDL's motion [Dkt. 61-12]; and, Paragraph 11 of the Greenhill Affidavit, attached as Exhibit 1 pg. 343 lns. 18-20 and pgs. 348:10-350:3 of the Moore Deposition, attached as Exhibit 5; pg. 105 lns. 8-23 and pg. 107 lns. 7-20 of the Deposition of Scott Dullard ("Dullard Deposition"), attached as Exhibit 11; pgs. 178:24-179:5 and pg. 180 lns. 9-24 of the Greenhill Deposition, attached as Exhibit 9; pgs. 104:3-105:7 and pgs. 205:23-206:23 of the B. Young Deposition, attached as Exhibit 6; Driller 002162 and Driller 0002246, attached as Exhibits 12 and 13; and, Deposition Exhibits 38 and 40, attached as Exhibits 14 and 15, respectively).

13.     Allen has since learned that TDL was not in possession of the equipment described in the work plan provided to Allen on October 27, 2016.  In fact, TDL did not even contact the equipment supplier, Akkerman, Inc. ("Akkerman") until September 2016.  As of that date, TDL was still at least 6 months away from securing the necessary equipment.  (See, Driller 002162 and Driller 002173, attached as Exhibits 12 and 16, respectively; and, pg. 343 lns. 18-20 and pgs. 348:10-350:3 of the Moore Deposition,

attached as Exhibit 5).

14.     Prior to late October 2016, TDL never expressed any concerns or objections to Allen about the subsurface conditions at the Project, the work plan, Allen's subcontract form, or any other issue.   On October 31, TDL advised Allen for the first time that Terracon's Supplemental Report supposedly revealed subsurface conditions at the Project (primarily sandstone), which TDL claimed fell within the rock exclusion in its April 2016 proposal.   TDL's proposal makes no mention of sandstone at all.   With respect to the types of materials listed in TDL's bid, the Youngs only excluded from TDL's base bid price the increased cost, if any, of encountering subsurface materials that would prevent the progress of its drilling operation.   In its October 31 letter TDL advised Allen that it was in the process of, "determining the appropriate equipment and also the time and material cost to perform the drilling work in rock."   Simply, Moore wanted to re-negotiate TDL's bid unit prices based upon the same information TDL had available to it prior to the submittal of its proposals.   Despite its promise to do so, TDL never provided any additional cost information to Allen.   (See, Exhibit 13 to TDL's motion [Dkt. 61-13]; Paragraph 12 of the Greenhill Affidavit, attached as Exhibit 1; pgs. 87:17-91:11 and pgs. 144:6-145:5 of the B. Young Deposition, attached as Exhibit 6; pgs. 65:12-67:5 and pgs. 87:4-88:5 of the K. Young Deposition, attached as Exhibit 4; and, pgs. 286:14-287:19 and pgs. 324:24-327:23 of the Moore Deposition, attached as Exhibit 5).

15.     Allen began communicating with Daniels in October 2016, to develop a contingency plan in the event TDL continued to not perform its obligations.   Although Allen was unaware of it at the time, TDL was also in contact with Daniels in October 2016

attempting to subcontract its drilling work to Daniels.  Allen was ultimately forced to hire Daniels to perform the work bid on by TDL as a direct result of TDL's inexcusable delays, failure to provide an acceptable work plan, insurance certificates, or W-9, refusal to sign a subcontract agreement, failure to provide any additional cost information as promised in its October 31 letter, and overall lack of performance.  Allen simply could not allow TDL to continue jeopardizing the commencement of the Project.  Allen did not pay Daniels to perform work excluded in TDL's proposal.  The only unexpected rock encountered was in the area of bore pits, where a 12" thick seam of shale was discovered.  The shale was at a much higher elevation than the drainage conduit and would not have impeded the progress of the horizontal drilling.   In short, Daniels' challenges had nothing to do with unanticipated rock at the location of the horizontal borings necessary to install RCP but were attributable to mechanical issues with its equipment and the associated delays in finding replacement equipment.  (See, pgs. 118:15-120:10, pgs. 132:21-133:3, and pg. 162 lns. 16-25 of the Deposition of Jeff Allen ("Allen Deposition"), attached as Exhibit 17; pgs. 170:21-171:6, pgs. 256:11-257:22, and pgs. 258:24-261:8 of the Greenhill Deposition, attached as Exhibit 9; Paragraphs 3 and 4 of the May 29th Reed Greenhill Affidavit, ("May 29th Greenhill Affidavit"), attached as Exhibit 18; and, Deposition Exhibit No. 43, attached as Exhibit 19).

16.    The subsurface conditions depicted in Terracon's Supplemental Report were no different than those shown in Terracon's earlier reports, all of which were included in the Solicitation Documents used by TDL to prepare its bids.  In fact, TDL fully anticipated encountering those exact conditions when submitting its bid to Allen and included all

associated costs in its bid price.  (See, pgs. 47:24-49:9, pgs. 126:5-127:16, pgs. 143:18-144:6, and pg. 171 lns. 9-19 of the K. Young Deposition, attached as Exhibit 4; pgs. 46:8-47:10, pgs. 65:8-66:9, pgs. 69:17-72:15, pgs. 87:17-91:11, pgs. 136:23-137:1, pgs. 141:10-145:5, and pg. 215 lns. 8-14 of the B. Young Deposition, attached as Exhibit 6; and, pgs. 121:25-122:25 of the Deposition of Norman Tan Deposition ("Tan Deposition"), attached as Exhibit 20).

17.     Allen provided a statutory payment bond on the Project for the benefit of all subcontractors, such as TDL.  (See, ALLEN 007602, attached as Exhibit 21).

18.     TDL's lost profit claim is unreliable. On March 5, 2019, almost 2.5 years after termination, TDL disseminated its initial disclosures claiming $271,174.58 in lost profits.  On June 28, 2019, Allen requested TDL's backup for its damages.  TDL did not produce any responsive documents.  On January 22, 2020, almost 3.5 years post-termination, Moore (as corporate representative for TDL) testified and disclosed for the first time that TDL now claims damages in excess of $1.2 million.  The amount of net profit TDL claims it would have earned is not in line with industry norms and is completely unreasonable.  (See, TDL's Initial Disclosure Extract, attached as Exhibit 22; Paragraph 3 of the May 29th Greenhill Affidavit, attached as Exhibit 18).

## LEGAL ARGUMENTS AND AUTHORITIES

Summary judgment is proper only where the moving party shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The movant bears the initial burden of demonstrating the absence of a dispute of material fact that warrants summary judgment.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, (1986).  If the movant carries this burden, the nonmovant must then go beyond the pleadings and "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(2). When applying this standard, the Court is "required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the motion," even when such evidence is produced by the moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Buchanan v. Sherrill*, 51 F.3d 227, 229 (10th Cir. 1995).

## I.     ALLEN'S PROMISSORY ESTOPPEL CLAIM

For good reason, TDL wants to avoid a very simple, well-established legal principle born out of the realities of the construction industry–subcontractors cannot renege on their bids once relied upon by a general contractor.  To permit them to do so with impunity would wreak havoc on both public and private construction projects.  In an effort to insulate itself in a sort of contractual "Neverland," TDL argues it is not liable on a promissory estoppel theory because its written bid was subsequently accepted by Allen; and, that it has no express contractual liability because it refused after five months of broken promises to sign Allen's subcontract agreement.  To be clear, Allen is not and has never sought to enforce the subcontract TDL ultimately refused to execute.  It does, however, seek to hold TDL responsible for refusing to honor its bid and perform its contractual obligations to Allen.

Before discussing TDL's specific arguments, it is important to emphasize that it makes no difference to the outcome of this case whether TDL's conduct is measured from

when Allen says its bid became binding (April 2016, when Allen relied upon TDL's proposal in bidding to ODOT), or when its bid was formally accepted by Allen in early May, 2016.  TDL was obligated to perform and wholly failed to do so.

TDL challenges Allen's promissory estoppel claim on two grounds: 1) Allen's formal acceptance of TDL's bid supposedly negates any promissory estoppel liability; and, 2) TDL contends the subcontract agreement tendered by Allen materially altered the terms of its bid.  Under these facts, Allen has every right to plead BOTH promissory estoppel and breach of contract as alternative legal theories.  After all, when Allen formally accepted and executed TDL's proposal on May 9, 2016, it made it clear that TDL was expected to sign a formal subcontract agreement.  The Youngs also recognized TDL would need to sign a written subcontract and promptly provide a work plan (and other submittals) to Allen.  Even Moore admits it is standard practice to execute a mutually agreeable subcontract, and that TDL was obligated to sign a subcontract and provide a work plan (and other submittals) to Allen.  Indeed, TDL never expressed any concerns or objections to Allen's subcontract language until October 31, 2016–more than five months after it first received a copy of the subcontract (and after many broken promises to sign it).

While it is true that promissory estoppel/detrimental reliance generally applies when there is no contract, the doctrine "may arise from the conduct of parties after the execution of a written contract.  *Patel v. Harless*, 926 P.2d 963, 965 (Wyo. 1996).  Allen has no intention of attempting to make a "double recovery," but it is entitled to present and argue these alternative theories based on the parties' conduct after Allen formally accepted TDL's bid proposal, and since a jury could find that a necessary element for an express

contract claim is lacking.  See, for example, *Cholier, Inc. v. Torch Energy Advisors, Inc.* 83 F. 3d 431 (10th Circ. 1996).  TDL's first contention is without merit.

As for TDL's second point, the Court need look no further than the subcontract Allen tendered to TDL.  It is troubling to read TDL's argument that the subcontract proposed by Allen somehow excluded or contradicted TDL's April 2016 proposal, did not reflect TDL's understanding that it would be paid for extra work on a time and materials basis, or required TDL to accept subsurface conditions excluded in its proposal.  The Youngs bid the Project on behalf of TDL with the understanding that it was governed by ODOT and FHWA standards and specifications.  Section 104.03 of ODOT's specifications is a changed or hidden conditions clause authorizing additional payment to Allen/TDL if they encountered subsurface conditions materially different than those shown in the Solicitation Documents.

After studying the Solicitation Documents, TDL submitted its bid and excluded hidden conditions that might impede the progress of its drilling operations.  Allen relied upon TDL's bid, was awarded a contract by ODOT, formally accepted TDL's bid and sent TDL a subcontract to sign.  The subcontract agreement did not differ materially or otherwise from TDL's proposal.  Article 13.b. of the proposed subcontract states, in pertinent part:

> This Subcontract **and the documents referred to herein** set forth the entire understanding of the parties with respect to the subject matter hereof.  Any previous agreements or understandings between the parties regarding the subject matter hereof are merged into and are superseded by this Subcontract. (Emphasis Added).

Article 4.a. of the proposed subcontract clearly and unambiguously provided for payment to TDL based on the "Attached Unit Price Breakdown and Quote." TDL's April 2016 bid was attached to and incorporated in the subcontract. In the event TDL encountered work beyond its base scope, Article 5.c. of the subcontract provided for payment on a time and materials basis. TDL's proposal was even attached to and incorporated by reference in the proposed subcontract! Unlike the cases cited by TDL in its motion, the subcontract tendered by Allen did not materially deviate from TDL's proposal. That's why TDL never complained for five months–it only objected after Moore realized TDL couldn't timely obtain the necessary equipment and decided to re-negotiate the unit prices in the proposal. In short, whether based on promissory estoppel or breach of contract, TDL must be held accountable for its failure to perform.

## II.   TDL WAS PROPERLY TERMINATED BECAUSE IT FAILED TO PERFORM ITS CONTRACTUAL OBLIGATIONS

Again, it makes no difference if TDL first became obligated to Allen in April or May of 2016—it breached its obligations long before November 2016, when Allen was left with no choice but to hire Daniels to perform TDL's job. Implied in every contract is a duty of good faith and fair dealing. The covenant imposes obligations on both contracting parties that include a duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party. *Restatement (Second) of Contracts*, 205 (1981); 13 Richard A. Lord, *Williston on Contracts* 38:15. Each party to a contract impliedly agrees not to prevent the other party from performing or to render performance impossible by any act of his own. (17 C.J.S. 967). Every contracting party

has a duty not to prevent or hinder performance by the other party.  The implied duties to cooperate and not to hinder are separate, albeit related, aspects of the overarching duty of good faith and fair dealing.

These implied duties are inherent in all construction contracts.  *EKE Builders, Inc. v. Quail Bluff Associates,* 714 P.2d 604 (Okla. Civ. App. 1985), and *Crawford v. Pioneer Box & Lumber Co.*, 105 Cal. App. 760 (1930).  Parties to a contract simply cannot interfere with impunity in the other party's right to perform. *See*, e.g., *Townsend v. Melody Home Mfg. Co.,* 541 P.2d 1370 (Okla. Civ. App. 1975); and, *Vogel v. Fisher*, 225 P.2d 346 (Okla. 1950).  Fair dealing emphasizes "reasonable action," while good faith is marked by "the exercise of reasonable diligence."  *Finnell v. Jebco Seismic*, 67 P.3d 339 (Okla. 2003).  With those ideas in mind, a quick review of TDL's conduct from May 2016 to October 2016 leads to the inescapable conclusion that it breached its obligations to Allen.[7]

On May 24, 2016, ODOT issued a notice to proceed to Allen.  Allen immediately asked TDL to provide its written work plan detailing the means and methods by which TDL would accomplish its work.  The Youngs recognized the urgency of the situation.  In the months following May 2016, Allen emphasized to TDL on multiple occasions the critical need to take steps to advance the Project so physical work could begin on schedule.  Promptly installing the RCP was essential to controlling flooding so that other Project work could proceed in an orderly and productive manner.  Allen spent months trying to get TDL

---

[7] As noted in Allen's motion for summary judgment [Dkt.65], TDL's proposal also expressly states, "Start Date to be coordinated with our office, usual lead time is three weeks."  Allen coordinated with the Youngs–unfortunately, there hands were tied by Moore/HBT.

to provide a written work plan, return a signed subcontract, and otherwise move forward with the Project.  TDL never expressed any concerns about or objections to its bid, the subsurface conditions, Allen's proposed subcontract, the scheduling demands of the Project, or any other issue.  On the contrary, TDL repeatedly assured Allen it would furnish the necessary work plan and return a signed subcontract.  It failed to do so.

By August 2016, Allen was justifiably concerned about TDL's broken promises and lack of action.  Allen reiterated to TDL on several occasions in September and October 2016, that it needed to proceed diligently with its work.  Again, TDL never expressed any reservations or misgivings about its bid, subsurface conditions, the subcontract proposed by Allen, or the Project.  Then, on October 12, Allen spoke to Moore and learned he had fired the Youngs.  Almost two weeks later, Allen informed TDL it would be forced to engage a different subcontractor if TDL did not promptly provide an acceptable work plan and return an executed subcontract.  A work plan was sent on October 27, but it was wholly inadequate.  On October 31, after five months of delay, TDL refused to sign Allen's subcontract and claimed that Terracon's Supplemental Report (which it had received months earlier) revealed subsurface conditions supposedly falling within the rock exclusion in its April 2016 proposal.

Of course, we now know none of that was true.  The conditions described in the Supplemental Report were no different than what the Youngs anticipated when preparing TDL's proposal and were fully accounted in TDL's unit pricing.  The real problem, so it seems, was that Moore wanted to negotiate new pricing terms and further delay the Project because the equipment TDL needed to perform would not be available for months.  Even

then, despite its promise to do so, TDL never provided any additional cost information to Allen.

Much of this litigation has focused on the rock exclusion in TDL's proposal. What gets overlooked is that TDL's base scope of work included over $2,000,000.00 in critical drainage work that desperately needed to be planned, scheduled and performed in a cooperative effort between Allen and TDL. TDL did not assist, cooperate or work with Allen in any form or fashion—it just stonewalled Allen while the Youngs tried to get Moore to honor TDL's commitment. TDL's inexcusable delays and refusal to cooperate with Allen constitute clear, material breaches of its contractual obligations. The Restatement (Second) of Contracts § 205 cmt. d (1981) explains the breadth of the implied duty of good faith and fair dealing and the consequences of breaching it:

> Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

An excellent opinion discussing the implied duty's place in Oklahoma law is *Zero Down Supply Chain Sols., Inc. v. Am. Airlines, Inc.*, No. 05-CV-327-TCK-PJC, 2006 WL 8458208, at *3-4 (N.D. Okla. May 18, 2006). Oklahoma has adopted the so-called "first breach" rule. *Murphy Oil USA, Inc. v. Wood,* 438 F.3d 1008, 1015 (10th Cir. 2006). Simply stated, a party to a contract is discharged from any performance obligation where the other

party first materially breaches the express or implied terms of the contract. *Express Services, Inc. v. Averette,* CIV-06-820-C, 2007 WL 1888652, at *2 (W.D. Okla. June 29, 2007). That is precisely what occurred in this case. TDL breached its duty of good faith and fair dealing through its repeated delays, broken promises and general lack of performance, thereby discharging Allen from any further performance obligation.

Finally, for the reasons stated in Allen's motion for summary judgment, TDL would not be entitled to its lost profits counterclaim in any event. TDL did not perform ANY agreement with Allen, substantially or otherwise. A claim for lost profits is simply too speculative to be recoverable.[8]

TDL's motion should be denied and summary judgment entered in favor of Allen.

> Respectfully Submitted,
>
> s/ Robert L. Magrini
> Robert L. Magrini, OBA #12385
> Evan B. Gatewood, OBA #13412
> Christopher D. Skelton, OBA #32920
> **HAYES MAGRINI & GATEWOOD**
> 1220 North Walker
> Oklahoma City, Oklahoma 73103
> Telephone:   (405) 235-9922
> Facsimile:    (405) 235-6611
> E-Mail:        robert@hmglawyers.com
>                      egatewood@hmglawyers.com
>                      cskelton@hmglawyers.com
>
> *Attorneys for Plaintiff, Allen Contracting, Inc.*

---

[8] This point may be best illustrated by the amount sought by TDL. TDL's base bid, when extended by unit pricing and estimated quantities, totaled $2,057,287.00. TDL now, several years later, claims it would have earned net profits in the amount of $1,117,260.08.

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 29th day of May 2020, the above and foregoing document was file with the Clerk of the Court and will be transmitted to the following ECF registrants:

Amy M. Stipe, OBA No. 18361
astipe@gablelaw.com

John M. "Jake" Krattiger, OBA No. 30617
jkrattiger@gablelaw.com

Kory D. George
kgeorge@woodsaitken.com

*Attorneys for the Defendants*

s/Robert L. Magrini
Robert L. Magrini